LULING & TOEL *vs.* THE ATLANTIC MUTUAL INSURANCE
COMPANY.

Gold coin can be treated, by parties, as a commodity worth more than its coined
or stamped value as money.

The court can treat gold coin as a commodity of greater value than its stamped
value as money or coin, when, and so far, as the circumstances of the
transaction show that the parties so treated it.

Where parties insured paid their premiums in gold coin, and in consideration
of payment in that manner, the insurers agreed to pay the losses, if any, in
gold coin; *Held* that the insurers were liable to pay, and bound to pay, the
losses, if any, in gold coin.

But an insurance company is not bound to pay persons insured their shares
of any contingent dividends or profits, in gold coin, unless there is some
understanding or implied agreement to that effect.

APPEAL by the defendants from a judgment of Justice
MILLER, given on the trial of an action at special term,
without a jury.

The action was by the plaintiffs, in behalf of themselves
and all other dealers with the defendants occupying the same
position with the plaintiffs, who might elect to come in, and
was brought to compel a re-adjustment of the statement
and declaration of dividends upon the business and earnings
of the defendants for the year 1863 and 1864, as made and
declared by the directors of the company, and an award to
the plaintiffs of a larger dividend for those years than had
been allowed them—the plaintiffs claiming that dividends
should be awarded them proportioned according to the value
in paper currency of the premiums paid in gold. The de-
fendants were incorporated as a mutual insurance company
by the legislature of this state, April 11, 1842, and the
charter was amended March 31, and again April 5, 1855.
The corporate powers of the company were vested in a board
of trustees, to be elected by persons holding certificates of
the earnings, and in such officers, clerks and agents, and
other persons, as said trustees might from time to time
appoint. The trustees, by the charter, have power to make
such by-laws as may be deemed necessary for the govern-

ment of the officers, and *conduct the affairs of the corporation.* By the charter, an annual dividend statement is required to be made, which shall contain a fair *estimate* of the net profits of the corporation not before divided, up to and including the last day of December in each year, taking into view the probable amount to be paid out on claims and demands which had been or might be made against the company, and allowing for any previous deficiencies, said statement to be completed in the month of January ; and after ascertaining in this mode the net profits of each period on risks "marked off," the trustees are *authorized to declare a dividend,* and the officers of the company may issue certificates of a certain per centum, on the premiums received for such "marked off" risks, to the persons in whose names the policies of insurance were originally issued, or their representatives. The charter declares, that the *amount named in such certificate, shall be conclusive on the parties entitled to receive them,* and that the certificates shall contain a proviso, declaring the same to be subject to any future losses and expenses of the company, until redeemed, and subject to be reduced by the board of trustees in case of losses and expenses, in any subsequent year exceeding the estimated profits of such year. The charter prescribes the securities in which the company may invest their funds, or any part thereof, and declares it to be lawful for the company from time to time to divide such profit of the accruing interest, as they may deem equitable, not exceeding six per cent per annum, to and among the holders of such certificates, or in case of losses, to declare a pro rata deduction of the amount of the outstanding certificates.

During the years 1863 and 1864, the defendants, for the convenience of importers of merchandise, adopted a course of business, in which, upon certain risks, upon the receipt of the premium in gold, they issued policies containing the clause "*loss, if any, to be paid in gold.*" The great bulk of the business of the company was for premiums paid in

currency, the policies making no mention of any medium for the payment of losses. The plaintiffs insured to quite an amount with the defendants during these years, under open policies, providing for the *payment of the losses, if any, in gold,* they paying the premium in the same. They also had other risks, in which the losses and premiums were payable in currency.

October 1, 1862, the defendants caused a notice to be printed and handed to their customers, and posted in their offices, and which came to the knowledge of the plaintiffs, to the effect that their insurances payable in gold, and the premiums upon which were paid in the same would *"·participate with others in the earnings of the company, which, however, will be computed and made payable in currency."* One of the policies issued to the plaintiffs, dated in January, 1864, (No. 5312,) had these words stamped on the face : *" Dividends of profits, if any, payable in currency."* The premium paid in gold upon this policy, was $26,841.25, at different times, and upon different risks,ʹ between February 10, and December 29, 1864. The plaintiffs paid to the defendants, in 1863, premiums in gold upon risks "marked off" the sum of $31,998.75, and in 1864, the sum of $32,464.44, and during each of these years paid large sums in treasury note currency for premiums upon other risks.

In January, 1864, and again in January, 1865, the defendants, as required by their charter, made their annual dividend statement, containing an estimate of the net profits of the company, for the year preceding, and declared a dividene of forty per cent upon the "marked off" risks, including the "gold risks" of the plaintiffs and others, making no discrimination between the different risks, whether the premiums were paid in gold or treasury note currency, and issued certificates for such per centum, to the persons entitled under the charter. In April, 1864, certificates for the dividend declared upon the earnings of 1863, upon the premiums paid by the plaintiffs in that year, were issued to the plain-

Luling *v.* Atlantic Mutual Insurance Company.

tiffs, delivered to and received by them without objection. Like certificates for the dividend upon the earnings of 1864, are made out and ready to be delivered to the plaintiffs. It does not appear that the company have ever sold any gold at a profit or otherwise ; but it does appear that they have at all times in possession, and had at the time of making each of the annual statements, and declaring the dividends mentioned, large sums of gold coin, part of which was received for premiums on "gold policies," and part as interest upon "five twenties," in which a very considerable portion of the funds of the company were invested pursuant to the charter. Upon the trial, the justice sustained the claim of the plaintiffs, and held and decided as matter of law, "that for the purpose of participation in the net earnings, declared applicable to dividend, as aforesaid, the plaintiffs are entitled to have the premiums paid in gold on 'marked off risks,' estimated according to the average market value of gold, in legal tender currency *between the* 31*st of December*, 1863, *and* 26*th of January*, 1864 ; *and* 31*st of December*, 1864, *and* 24*th January*, 1865, respectively ; and to receive additional certificates for the increased dividend resulting from such computation." A reference was ordered " to re-apportion according to such computation the said amounts so declared by the trustees of the defendants, as applicable to dividend, and to ascertain and report the amount of certificates to which the plaintiffs would be entitled on such re-apportionment, &c. and upon the coming in and confirmation of the report, it was ordered that judgment be entered, directing the defendants to deliver to the plaintiffs the certificates, and pay them the sum of money to which, under the said report they may, upon the principles of the decree, be found to be entitled." The amount was adjusted by stipulation upon the principles of the decree, the parties agreeing that the stipulation should have the effect of a report by a referee, and that nothing therein contained should be or be construed an acquiescence by the defendants in the

decree or its principles or directions, or as a waiver of their rights of objection or exception in the premises.

Judgment was entered upon this stipulation as upon a report of a referee, and the defendants were directed to prepare and deliver to the plaintiffs a certificate for $6910 as the profits for the year 1863, and for $15,320 as the profits for the year 1864, in addition to the sums allotted by the defendants as the dividend to which the plaintiffs were entitled upon the profits of those years respectively.

Exceptions were taken to the ruling and decision of the justice by whom the action was tried, and the defendants appealed from the final judgment.

*D. D. Lord* and *William F. Allen,* for the appellants. I. This court has not jurisdiction, or authority, within well established rules of equity, to grant the relief demanded by the complaint and granted by the judgment of the court at special term. The duty of making the annual dividend statements and estimates is imposed, and the authority to declare dividends, and to determine the per centum thereof, and issue certificates therefor, is conferred upon the directors of the company by its charter. Those acts call for the exercise of judgment and discretion, which can by law only be exercised by those to whom the law has expressly committed, and necessarily to the exclusion of every other tribunal or body, " the government of the officers and conduct of the affairs of the corporation." If the directors mismanage, they may be removed, and certainly will not be re-elected ; if they contemplate and threaten the perpetration of a fraud, they can be restrained, and their fraudulent and wrongful acts may be annulled by a court of competent jurisdiction. But the law does not authorize the substitution of this court, a referee, or any other individual or tribunal, in the place of the directors, to regulate the affairs of the company, to direct the mode and manner of keeping their accounts, and estimating the net profits ; to determine whether any dividend shall be de-

clared, or if any, at what rate per centum ; to decide the amount of a reserved fund for the payment of losses, and whether any, and if any, how much of such fund shall be in gold, and in what securities or property generally the funds of the company shall be invested ; or to decide any of the very many questions, some entirely discretionary, some requiring an intimate and practical knowledge of the business of the company, and all important elements in estimating the profits, and determining upon the rate of dividend. In the absence of fraud or excess of power, a court of equity will not supervise the internal administration of a joint stock company. It has no visitorial power, and any claim to sit in judgment upon the conduct and management of its affairs, must be referred to some one of the heads of equity jurisdiction. This is not a case for the exercise of the equity powers of the court. (*Stevens* v. *South Devon R. R. Co.,* 9 *Hare,* 113. *Gardner* v. *London, Chatham and Dover R. R. Co.,* 15 *Weekly Reporter,* 325. *Referred to* 6 *Am. L. Reg.* 455.)

II. The legislature, as if to put the matter definitely at rest, and make the action of the directors in the declaration of a dividend conclusive upon all, declare by the charter, that the amount named in the certificates *therefor shall be conclusive on the parties entitled to receive them.* Every insurer in the company assents to this provision when he takes his policy, with the contingent right of membership. There being no fraud alleged, no error or mistake in the computation, upon the basis adopted by the directors for the management of the affairs of the company, there can be no valid reason assigned for an increase of the dividend by a court of equity in behalf of one thus concluded and estopped, as well by the law as his own act and assent.

III. If the court, as a court of equity, has any authority or jurisdiction in the premises, it can only annul and vacate the acts of the directors which it may adjudge wrongful and prejudicial to the party complaining. It should go farther

and judicially declare the principles upon which, as between the different classes of policy holders or members, business should in the future be conducted, and profits estimated and dividends declared and certified, which would to that extent be a usurpation of the statutory powers and duties of the directors. It cannot, as was done by the court below, proceed and make the estimate, ascertain the profits, declare a dividend and determine the rate per centum, and compel certificates to be issued therefor. The equities between the different classes of members and the just basis of estimate and dividends when declared, having been judicially settled, it was then exclusively for the directors to determine whether upon such an estimate and basis a dividend should or should not be declared, and to fix the rate. *Non constat* that it would have been deemed discreet or proper either to sell the gold, or retaining the gold to make a dividend at all, or at the same rate as that which had been fixed upon another basis. It was for the directors, not the court to say. The dividend, as fixed by the judgment, is not a dividend declared by the directors, but enforced upon them by the judgment of the court.

IV. But if the court can review the action of the directors, sitting in judgment upon the exercise of their discretion, and correcting the errors and mistakes of judgment, and reforming the dividend certificates issued, the judgment at special term is nevertheless erroneous and must be reversed. 1. An arbitrary period is adopted, at which the value of the gold paid by the plaintiffs during the year preceding is to be determined. The table giving the value of gold during the year, making a part of the case, shows great and rapid fluctuations during the years 1863 and 1864. Upon the theory adopted by the learned justice, the value of gold in currency at the time of the payment of each premium, should have been ascertained, for that, upon every principle consistent with the decree was the true current paid, and the aggregate of the currency value of the premiums for the year thus ascer-

Luling *v.* Atlantic Mutual Insurance Company.

tained would have given the amount upon which the plaintiffs' dividend should have been computed. There is no rule by which the court could adjudge that the defendants did sell, or ought to have sold, their gold in January of each year, so as to give the payers of premiums in gold the benefit of its value "in currency," at that precise time. 2. But upon any view of the rights of the parties favorable to the plaintiffs' claim, and to give them the full benefit of the gold payments and of the gold premiums of the policy, the only proper relief would have been to make the dividends redeemable and the interest thereon payable in gold. The claim is that the parties have made gold the sole currency to be employed in their dealings and in settling all their rights under the gold policies or resulting from them. We agreed to pay gold upon losses. The court below said that we were also bound to ignore the ordinary currency in the matter of dividends. But instead of recognizing our certificates for the dividends redeemable in gold, we are compelled to pay in currency at a rate and price fixed in reference to its market value at a time arbitrarily fixed by the judgment. As in the agreement to pay losses in gold the defendants took their chances of a higher or lower price for gold, then the losses should be payable so they should have the benefit of the same chances in the payment of their dividends.

V. If the claim of the plaintiffs to be distinguished from the other policy holders and members of the company in the computation and payment of dividends is referred to the policy or contract of insurance, and is made to rest upon that, it is submitted that it cannot be maintained. 1. From the passage of the act of congress in 1862, known as the "Legal Tender Act," the ordinary currency, (and standard of value,) has been the legal tender notes, and except in very special cases they have been payable in discharge of any and every pecuniary obligation. They constituted the only currency known in mercantile transactions, and the law recognized no distinction between them and gold and silver coin

of the same nominal amount. (*Metropolitan Bank* v. *Van Dyck*, 27 *N. Y. Rep.* 400. *Kempton* v. *Bronson*, 45 *Barb.* 618.) 2. To entitle a party to demand gold or silver coin in discharge of pecuniary obligations, the right must be secured by express stipulation and contract, and the obligation to pay in coin instead of currency will not be extended by implication beyond its terms. It is against public policy to depreciate the currency established by law, and obligations to pay in coin are onerous and oppressive to the obligors when the value of the ordinary legal tender currency is less than the same nominal amount in coin. 3. The parties have, in terms, agreed that the premiums and losses shall be paid in gold. Every other claim under or growing out of the policy, they have left to be settled in the ordinary currency of the country. This is the legal effect of the contract within well settled rules of interpretation. *Expressio unius*, &c. 4. There is no claim that the omission to provide for the payment in coin of all other contingent or incidental claims, was by mistake or accident. The purpose and object of the policy, the contract of insurance, was to secure indemnity to the insured, and a proper compensation for the risk of the insurer, and the contract embraced these subjects and no other, and the payment of the premium in gold was compensated by making the losses payable in the same. The one was a precise equivalent for the other, and was so regarded, and the contract had answered all its purposes when the risk had expired and was " marked off." The contract of the parties then became *functus officio.*

VI. The parties have, by their acts and dealings, practically construed the contract in accordance with 'this view of its legal effect. Their acts and dealings are entirely inconsistent with the claim now made. To suffer the plaintiffs now to retreat from their position, after having induced the defendants to contract with and insure them under the special policies in question, with the mutual understanding that the " gold " provision only had respect to and did not extend to

any claim other than the premiums and losses would be unjust and·inequitable. . 1. In the contract there is no allusion to any difference in value between the gold and the legal currency dollar. The premium paid is entered and receipted at its nominal or par value. In other words, the parties regard it as so many dollars paid, and the plaintiffs accept their contracts and receipts, which constitute the evidence of their rights, in this form, without objection, or claiming that the receipt and contracts should express an amount equal to the currency value of the gold, or any amount or consideration other than the amount nominally paid. 2. The notice of October 1, 1863, of which the plaintiffs had knowledge, advised the customers of the plantiffs, that holders of the "gold" policies would only be entitled to dividends upon the nominal or par value of the sums paid by them, and that the practice of the company would continue in the future the same as it had been theretofore ; and that in arriving at the amounts upon which policy holders would be entitled to dividends, no distinction would be made between payments in gold and those made in currency. It is preposterous to say that the effect of that notice was, that the gold would be estimated at its currency value, and the compensation and estimate be made upon that basis. Thus read, the notice was without meaning or effect, and it was not so understood by the plaintiffs. 3. In January, 1864, they procured an open policy, under which they were insured upon very many risks during all the year, stamped across its face, "dividends, if any, payable in currency." This the plaintiffs understood to indicate, that in the matter of dividends, premiums paid in gold would only be regarded as so much paid in currency. They objected to it for that reason, but waived their objections and acquiesced in this declaration of their rights. It was optional with them to insure on these terms. If they did not acquiesce in them, they should have so said to the defendants, that they might also have exercised an

option as to insuring and admitting to membership upon any other terms. 4. In April, 1864, they received the certificates for the dividends of the net profits of 1863, to which they were entitled upon the estimate and basis of the defendants. They did not object to it, and continued to insure thereafter, and the defendants were bound to assume that they assented to the action of the defendants, in keeping the accounts and dividing the profits. It is now quite too late for the plaintiffs to make a claim so inconsistent with their whole course of dealing and action.

VII. The right to share in the profits of the company is not referable to and does not rest on contract, and is not and cannot be the subject of an agreement. It is one of the rights of membership, and is conferred by law. The right is contingent in the policy holder, depending upon the earning of profits to the extent authorizing in the judgment of the directors, a dividend. If a dividend is declared, the law requires the profits divided, to be apportioned *pro rata* among those entitled. The essential requirement of the law is mutuality and equality among the members or partners ; each being entitled to a dividend in proportion to the amount actually *paid* for premium, not the amount which the company had or might have realized by a proper use or timely conversion of the specific article or money received from each insurer. This amount is named by the parties at the time, and is subject to no fluctuation thereafter. The company may receive bullion, coin, the bills of state or national banks, or any chose in action or chattel, which they may lawfully buy in payment of premium, but the right of the party to share in the dividends will not fluctuate, because the value of the thing received may be in truth more or less than its nominal valuation in the transaction, or because it appreciates or depreciates thereafter. It would be an anomaly if a party could resort to extrinsic evidence, or it should under any circumstances be left in doubt, or a matter of subsequent agreement, or a suit at law or equity, to determine the pre-

cise amount and value of the premium paid by each policy holder, with a view to ascertain his pro rata share of the dividends. A mutual insurance company could not be conducted or managed under such a system, or rather want of system. Unless the amount named in the policy (in the absence of fraud or mistake) and entered upon the books of the company is to control, the whole subject of dividends is at sea, and there may be as many law suits as there are policy holders. Indeed, a change in the rate or amount of dividends paid to one, may make a change throughout necessary or proper. No declaration of dividend can become final until the statute of limitations has barred an action to correct it.

VIII. The whole course as well as the general nature of the business of the defendants is opposed to the claim of the plaintiffs, and as this was committed by statute to the management of the directors, it is final. The course adopted and followed, was in accordance with the charter of the company, and strictly equitable as between the members of the company. 1. Although the premiums were paid in gold, yet in the policies as well as in the accounts of the company, and in all its estimates of profits, the only amount expressed or regarded as paid, was the nominal or par value, and no expression is anywhere found, indicating that the amount was to be varied for any purpose. 2. No gold was ever sold by the company, and they therefore have never realized any profit upon it. The gold received for premiums, as well as that received for interest upon large investments in government securities has been retained, except as paid out for losses on "gold policies." Whether retained as a precautionary measure or a reserve fund to meet losses payable in gold, or as an investment of so much of the funds of the company; its retention was within the discretion confided to the directors and is not the subject of judicial control, and in either case the company have but so many dollars as are represented by the gold at its par value. It is so regarded by the defendants, and is so entered in the accounts, state-

ments and estimates. Who shall say that they shall do otherwise in the premises ? 3. If the company had sold the gold or made a profit by its conversion into currency, the plaintiffs' claim would not be improved. The earnings of the company, whether from gold or currency premiums, entered into the general profit and loss account of the company, and were liable without distinction for all the losses, whether payable in gold or currency. So losses upon gold policies were payable from the general assets of the company, irrespective of the source from which they were received. 4. The company did not carry on two separate kinds of insurance, allowing separate computation of gain and loss, but one general business. These contracts of insurance are in some instances special, but there was no classification of the business with a view to dividends, or for any other purpose. 5. If any distinction is to be made between policy holders and members, in respect to their share of the net profits, it can only be done (if indeed it can be done at all lawfully) by the action of the directors, and then only by a classification and a separate estimation of the profits and loss of each class, and dividing to the members of each class, the profits arising from the business peculiar to it. To discriminate in any other way between the different policy holders, and to assign to any more than a proportionate share of the profits, may lead to injustice, and will be irregular. It may happen that while the corporation has earned large profits upon its business in the aggregate, one branch may have been disastrous, and that branch may be the very one in which the policy holders claim, and upon some specious pretext will be held entitled to, a larger share of the general earnings than the others. This may have been the case with the risks of the defendants payable in gold during the years 1863 and 1864.

*S. P. Nash,* for the respondents. I. Though the court will not control the action of trustees in matters within

their discretion, e. g. whether they will declare a dividend or not ; yet if the trustees set apart a sum to be distributed in dividends, the court will compel them to divide it according to the rights and equities of those entitled. A dividend of five per cent to one stockholder and ten to another, both being entitled to the same dividend, would never be tolerated. There can be no reasonable doubt as to the power and jurisdiction of the court. (*Gregory* v. *Patchell*, 33 *Beav*. 595. *Henry* v. *Great North Western Railway Co.*, 4 *Kay & J.* 1, 17. *Dodge* v. *Woolsey*, 18 *How. U. S.* 331, 341, 342. *Robinson* v. *Smith*, 3 *Paige*, 231. *Angel & Ames on Corp.* § 312. *Hutton* v. *The Scarborough, &c. Co.*, 2 *Dr. & Sm.* 514; *affirmed* 13 *W.* 631.)

In this case the directors determined what sum they would divide on profits earned, and what sum they would retain to meet their liabilities ; no complaint is made as to their decision in these respects. The complaint is that they have divided unequally the sum they set apart for distribution.

II. The action of the directors is not conclusive upon the dealers, nor are the certificates. The provision in section 13, that "the amount named in such certificates shall be conclusive on the parties entitled to receive them at such periods, and not to be changed by subsequent events, showing the actual payments to be more or less favorable than the estimates," merely means that taking one year with another, dealers shall be concluded by the estimate of the directors in respect to the profits of each year. These are a matter of estimate, as risks are always outstanding. The directors reserve a fund which they suppose sufficient to meet these risks. If it turns out that the sum reserved in January, 1864, to meet the risks taken in 1863, and outstanding, is more than sufficient, the dealers of 1863, are not entitled to have the excess awarded to them, but it goes into the general fund.

III. The question is simply one of equality of distribution, and did it not involve the difference between the paper

currency created by the legal tender act, and gold and silver, would seem already determined by several decisions.

There are several methods by which the theory of mutual insurance is worked out. One is the plan by which the policy holder gives a note for the full amount of premium he would pay in a stock company, but pays only a portion of the note in cash, the note being held as a security for dealers and liable to be assessed to make up losses. Here, the benefit to the dealer is in the economy of insurance. But the principle is the same whether he pays a full premium in cash, and gets a return of what is not needed to pay losses, as in the defendants' company, or pays a smaller sum in cash and gives his obligation to pay his proportion of what more may be needed to pay losses.

It has been settled in several cases that assessments of insurance notes must be upon a principle of equality. (*Bangs* v. *Duckinfield*, 18 *N. Y. Rep.* 592. *Bangs* v. *Gray*, 2 *Kern.* 477. *White* v. *Haight*. 16 *N. Y. Rep.* 310.)

The equality of contribution, liability and benefit among the members of a mutual company is likened to that of co-sureties. (2 *Kern.* 486 ; *and see The Sun Mutual Insurance Company* v. *Mayor, &c. of New York*, 4 *Seld.* 241, 249. 16 *N. Y. Rep.* 424.)

IV. The statement made up by the defendants themselves and accepted by the plaintiffs in lieu of the report of a referee, shows that by reducing to an equivalent currency the premiums on which the earnings were to be divided, the plaintiffs became entitled for the two years to additional certificates for over $20,000. This is the result of equalizing, as far as practicable, the value of the premiums paid by each class of dealers, and should be sanctioned by the court. 1. But the defendants claim that the right of dealers to the earnings made by their money, not being under any express contract, results from the course and usage of business of the defendants and is subject to the discretion of the officers of the company. This is certainly not so. The

Luling *v*. Atlantic Mutual Insurance Company.

right to any dividend at all depends upon the success of the company in earning profits. Whether profits earned shall be divided is, to a certain extent, in the discretion of the trustees, but if they fix upon a sum to be divided, the right of the dealers to share in proportion to the premiums paid by each is fixed by the charter, and the law imposes the duty of so computing the premiums that equality of dividend shall be the result. Certainly the trustees could not say that the premiums paid by one dealer should, for the purposes of a dividend, be computed at double what he had paid and those paid by another at one half. 2. It is found as a fact, and is too notorious to be questioned, that the requirements of foreign trade and intercourse rendered necessary during the period in question an adherence for many purposes to the specie standard. The federal government itself required the custom duties to be paid in specie, paid certain of its own obligations in specie, others in paper currency, and in returns made to the tax assessors, exacted that gold receipts should be reduced to their value in currency. The defendants themselves made the same discrimination by contract, and in fact, between the specie and paper currencies, which existed in the commercial world and which was made by the government, and the legitimate results of this discrimination should be adhered to. 3. The defendants cannot, by claiming that they kept their accounts in the ordinary money of account disregard the actual difference in value between the two currencies. If the two classes of dealers had distinct rights, it was the duty of the defendants to keep their accounts so as to protect the rights of each. They have made up a statement themselves which shows there is no difficulty in so doing. 4. The question involved is in no way determined by the legal tender act. In the payment of *debts*, that act makes the United States notes equivalent to specie, but in all matters between *trustees* and *cestuis que trust* the courts must recognize the difference between the two currencies. If a trustee is obliged to buy

gold or foreign exchange for his *cestui que trust,* he can charge it in his accounts at its cost in currency; if he sells gold belonging to his *cestui que trust* at a premium, he is obliged to account for the proceeds in currency.

V. The company adopted its own mode of doing the business connected with the two classes of policies it used. It might perhaps have made the losses occurring under the gold policies payable specifically out of the gold premiums, but, any way, the obligation to pay in gold was probably an honorary one, that could not have been enforced at law, though possibly it might in equity. But the company assumed that on the whole the premiums paid in gold would more than pay the losses incurred, and then the result would follow that the gold surplus would equitably belong to those who had paid it, and that it should be returned to them *in gold* by way of dividend. 1. The company, however, expressly forestalled this expectation by giving the notice, that the earnings would " be computed and made payable in currency," and they susequently stamped a similar notice on the last policy, " dividends of profits, if any, payable in currency." While this clearly means that the dividends were to be payable, not in gold, but in currency, it also implies that they were to be " computed and made payable," at their *equivalent* in currency. The construction now claimed by defendants' counsel for this notice, that it means that the premiums were to be computed at the same nominal amount, whether paid in gold or currency, is not the apparent meaning of it, and the defendants are not entitled to any benefit from such a forced construction of the notice. 2. But the defendants had no right to impose upon the dealers with the company by a mere notice any restriction upon their rights to share in the profits. They may have had a right to issue policies not entitled to share in the profits, but in such cases the dealer would get a consideration in the different rates of insurance. So, after the dividend was declared, they may have had a right to commute the

dividend certificate for cash. But a mere executive officer of the company had no right by a mere notice to put any dealer who paid his full rate of premiums on worse terms as to his right to dividends than others paying no higher rate. The notice in question was not given by any order of the board, but was only a little officiousness on the part of the vice-president.

VI. The receipt given for the certificate of 1863, was no bar to the plaintiffs' right to relief. It was a mere receipt, nothing more, which is never conclusive between parties, unless it embraces also the elements of a contract. Much less is it conclusive as between the officers of a company, and its shareholders, between trustees and their *cestuis que trust.* There was no contract here that the company by giving to the plaintiffs a simple certificate of profits should be protected from any inquiry as to the manner in which they had been made up.

VII. The statement furnished in lieu of the report of a referee furnishes the data for awarding to the plaintiffs additional certificates for either one of two amounts. The court, at special term, awarded the larger. This was clearly right. 1. The action was brought by the plaintiffs on behalf of themselves and all other dealers who had paid premiums in gold. The first basis of calculation assumes that these other dealers have all come in and claimed the benefit of the relief awarded to the plaintiffs. In that case, by computing *all* the gold premiums paid in as turned into currency, the total amount of premiums is increased so as to reduce the rate of dividend from forty per cent as declared, to 38.86 per cent. The second basis assumes that these other dealers have elected *not* to come in, and accordingly the total amount of premiums upon which the dividend is declared is increased by turning only the *plaintiffs'* gold premiums into currency, and this leaves the rate of dividend originally declared substantially unchanged. 2. The admis-

sion that no other dealers have claimed or will claim an increase of dividend, estops the defendants from setting up any claims of such dealers as affecting the plaintiffs' rights. The case must, therefore, be considered as though all other dealers had elected, after due notice, *not* to claim in this action, in which case they would be bound by the decree. (*Hallett* v. *Hallett*, 2 *Paige*, 19. *Story Eq. Pl.* § 99.) There is no reason, therefore, for converting the gold premiums paid by other dealers, merely to award to them an increased dividend which they do not claim, and which would, therefore, only fall back into the contingent fund of the company.

VIII. But the same result upon which the judgment is based can be reached in another way, and the only difficulty at all in getting at the true amount is owing to the defendants' refusal properly to manage the two departments of the business they have created. 1. The fund to be distributed in the way of dividends is the accumulation of premiums received for marked off risks, that is, risks which have terminated without a loss. After ascertaining the net profits on risks marked off " the board of trustees may declare a dividend, and the officers of the company may issue certificates of a certain per centum on the premiums received for such marked off risks." (§ 13.) By the same section, the defendants have the whole of the month of January in each year to make up their statement for the previous year. They were not bound to convert the gold premiums as fast as received, nor until it was ascertained that there was a surplus of them applicable to dividends. But when the rate of dividend was declared, the true course was to convert the gold applicable to profits at the best price, and to treat as converted, *at the same rate*, the amount of gold premiums upon which the dividend was to be made. So doing, the rate of dividend would not be changed, as the following statement will show.

By the report for 1863, it appears that the total amount of premiums received for risks marked off was :

Luling *v.* Atlantic Mutual Insurance Company.

Currency. . . . . . . . . . . . . .$6,285,327 56
Gold . . . . . . . . . . . . . . .   299,846 71

                                     $6,585,174 27

And the rate of dividend, forty per cent, requiring to pay for it, $2,634,070. Now to pay the forty per cent on the gold portion of the premiums, would require $119,938 in gold, and the defendants had on hand in gold $412,787.14. The premiums have been increased, by converting the gold portion at 1.54, thus :

Currency premiums . . . . . . . . . .$6,285,327 56
Gold, $299,846.71, at 1.54 . . . . . .   461,763 93

    Amount as increased . . . . . . . .$6,747,091 49

To divide the profits, ($2,634,070,) by this increased sum of course reduces the dividend, but increases the portion of profits consisting of gold, by converting it at the same rate, and the dividend remains the same, to wit, forty per cent. Thus :

Profits to be divided $2,634,070.

Of this in currency, . . . . . . . . .$2,514,132 00
In gold $119,938, at 1.54 . . . . . . .   184,704 52

    Increased profits, . . . . . . . . .$2,698,836 52

Which pays just forty per cent on the amount of premiums, as increased by converting the whole gold portion of them into currency, $6,747,091.09. 2. It was the duty of the defendants to sell that portion of the gold profits appropriated for dividends. There was nothing else that they could properly do with it. It was profits, and therefore not needed to pay losses. They had already reserved the proper amount of gold to meet their outstanding gold risks, estimated on the same basis as in the currency branch of their business. They can have no gold liabilities of any other character. Investments made by them should be made in

currency, as no others could be enforced. To hoard the gold was against a true public policy, and clearly for the company to turn gold speculators would have been beyond the purposes for which the company was formed.

IX. There was no error in the decision at special term, directing the defendants to compute the value of the gold premiums, according to the average value between the end of the year and the day in January when they made up their statements. 1. Unless the defendants can show that they are prejudiced by taking the average price of gold during the first twenty-five days of January, instead of the exact price on the last day of the year, the decision should stand. There is no evidence that they have been thus prejudiced. 2. The court, as a court of equity, dealing with trustees, has the power of doing substantial justice between them and their *cestuis que trust,* and is not tied down to mathematical accuracy. Thus when a trustee has employed trust estate in private speculation, but has so confused the accounts that the exact profits cannot be ascertained, the court may charge him with compound interest ; or, where he omits to collect rents and profits, or to account for them, with what the estate would reasonably have produced. (*Green v. Winter,* 1 *John. Ch.* 26. *Rogers* v. *Rogers,* 1 *Paige,* 188. *De Peyster* v. *Clarkson,* 2 *Wend.* 77.) There was here a clear available amount of gold applicable to the payment of dividends on the gold premiums marked off. The defendants had a right to convert it into currency when they made up their annual statement, and add it to the sum in currency set apart for distribution as dividends, and the court would never have interfered if they had taken the same rate so ascertained as the rate for the computation of the currency value of the premiums received in gold. But, because they choose to hoard their gold, and cannot be compelled to sell it, they hope to baffle the court in its attempt to render substantial justice.

Luling *v.* Atlantic Mutual Insurance Company.

*By the Court*, SUTHERLAND, J.   Assuming that the court had jurisdiction, I can discover no legal or equitable principle upon which the judgment in this case can be upheld.

Specie has ceased to be currency, but has not ceased to be money.   You *can* pay a debt in gold or silver coin, at its denominational or stamped value.   You *can* use gold coin as money, at its denominational or stamped value, instead of currency.   Gold coin *can* be treated by parties as a commodity worth more than its coined or stamped value as money.   The court can treat gold coin as a commodity of greater value than its stamped value as money or coin, when, and so far, as the circumstances of the transaction show that the parties so treated it.

The plaintiffs paid the premiums which they paid on the four open policies, in gold coin.   In consideration of the payment of the premiums in gold coin, the defendants agreed to pay the losses, if any, in gold coin.

I have no doubt that the defendants, under this express agreement were liable to pay, and bound to pay, the losses, if any, in gold coin.   But this was the extent of the agreement.   There was no agreement, that the plaintiffs should be paid their shares of any contingent dividends of profits in gold coin.   The circumstances of the transaction do not show that there was any understanding or implied agreement of this kind as to dividends of profits.   The circumstance that there was an express agreement to pay any loss in gold coin, and that there was no express agreement as to the payment of dividends of profits, considering that any dividend of profits was contingent and incidental to the main purpose for which the premiums were paid in gold coin, and that the plaintiffs' right to share in the profits, arose from the charter, or constitutional organization of the defendants, and not from contract, tends almost conclusively to show that there was no understanding or implied agreement, that the plaintiffs should be paid their shares of any dividends of profits in gold coin.

The dividends which the directors did declare, violated no principle of equality as to the plaintiffs, if they had no right to have their shares of the dividends paid in gold. The court cannot say that they had this right, unless there was an agreement express or implied to that effect, and there is nothing in the case to show any such express or implied agreement or understanding. On the contrary, there are circumstances, some of which have been adverted to, tending to show that there was no such agreement or understanding.

As to dividends of profits, the court must treat the premiums paid in gold the same as if they had been paid in currency, unless there is something in the case to show that the parties intended differently. There is nothing in the case to show this, but much in it to show that the parties understood that as to the matter of dividends of profits, there was to be no distinction made between those who paid premiums in gold, and took gold policies, and those who paid in currency, and took the ordinary policies.

The plaintiffs paid their premiums in gold, and received for such payments in gold, undertakings that their losses, if any, should be paid in gold.

The court cannot affirm the judgment in this case without making or implying a new and further agreement to pay the plaintiffs their share of the dividends of profits in gold, in the face of the circumstances of the transactions, tending to show that there was no such agreement.

A, B, and C, are partners. A pays in $10,000 in gold coin, and B and C each $10,000 in currency, as capital. On dissolution, A is to have back his $10,000 of the capital in gold coin, and B and C are to have back in currency the shares of the capital which they paid in currency, *and the profits are to be divided equally.* Has A any right to have *his share of the profits* paid in gold coin? I can discover no principle or ground upon which it can be claimed that he has.

I have not adverted specially to the circumstance that the

case shows that the premiums paid by plaintiffs, subsequent to October 1, 1863, were paid with express notice, to the effect that their participation in the profits would be the same as if they had paid the premiums in currency, for I have not deemed it necessary.

The judgment should be reversed and new trial ordered, with costs to abide the event of the action.

[NEW YORK GENERAL TERM, January 6, 1868. *Geo. G. Barnard, Ingraham* and *Sutherland,* Justices.]